The case this morning is ReCor Medical, Inc. and Otsuka Medical Devices v. Medtronic Ireland, 2023-2251. Mr. Bell, when you are ready. Thank you, Your Honor. Good morning. May it please the Court. Gabe Bell for the appellants. I'd like to focus our time today on what I consider the Board's primary error, what I'll call the Belden error. The Board failed to accept the full scope of the Acker prior art reference. And that, we submit, aligns this case squarely under Belden and EWP. Can I ask about that? Because that pervades all of your briefing. Yes, Your Honor. And even if you're right, I mean, I guess we get so many of these IPRs and 95% of them we just accept as a substantial evidence review. I understand why in some cases de novo and substantial evidence may reach a different result. But it seems to me I could cast virtually all of our IPRs as either being they didn't read the prior art for everything it says and make it a legal issue or say substantial evidence doesn't support the Board's construction of the prior art. So I guess what I'm looking for is why this, by going for you in this regard and on that basis, wouldn't kind of open the door to all IPRs subject to a legal challenge as opposed to an ordinary everyday substantial evidence challenge. Do you get my point? Yes, Your Honor. Absolutely. We want to know where to draw the line. I would make one point preliminarily that in Belden itself, it couched it as a legal error. It said leading up to that, you know, even giving the Board the deferences due under substantial evidence, we ultimately find a legal error here. So the question is where to draw that line. And I think we don't necessarily need to go any further than the bounds of this case, where on its face, Acker broadly discloses use of an ultrasound catheter in the circulatory system and in vessels within the circulatory system. And that's where I think the Board went a little bit astray. But the Board dealt with all the arguments. It's not a case where the Board ignored arguments or didn't even deal with them. The Board dealt with it and, in your view, came up with the wrong conclusion. And so I don't see why the answer should be different, whether it's substantial evidence or de novo, but that's not your problem. I think in this case it would be the same, substantial evidence or de novo. We've presented it as de novo, but it could be either way. And I think the way the Board dealt with it is key. And this is at appendix pages 22 to 25, where the Board, in our view, reasoned backwards. So it said there's this one particular embodiment put in figure one of Acker that deals with ultrasound catheter in the context of a pulmonary vein. And the Board then said, and you didn't show that that narrow use of it would mean it would be applicable to other areas in the circulatory system. And our point is that the broader references in Acker already teach that. So if you look at the summary of invention, for example, it nowhere mentions the pulmonary vein context. If you look at the abstract, the same, it talks about blood vessels in the circulatory system. Do the claims mention pulmonary? Very good point, Your Honor. No, they don't. In fact, most of them don't mention a location in the body at all. The ones that mention a location in the body, and that's claims 9 through 13, similarly say in the circulatory system. Insert this catheter into the circulatory system to a location within a circulatory vessel. That's all they say. Claim 14 is the most specific claim. It says use it in a vessel that communicates with the heart. So even that doesn't say in the pulmonary context. And Acker actually goes out of its way in column 8 to say we've presented certain things in this, but we're not limiting it to those. It can be within any or without. In other words, within or around any of the vessel, any tubular structure in the body. This almost sounds like you're arguing anticipation, which I know you're not. I mean, you're not arguing that you need Acker for the renal use. That's in Levin, right? Correct. Well, we have two grounds. We have the Acker-Levin grounds, which is Levin provides the renal context and the use of kind of catheter-based systems to ablate tissues. And then Acker says here is an ultrasound-based catheter that you could do that with. So that's the first ground. It's actually two grounds, but we'll consider them as one. Then there's the other ground or two grounds where it's Acker alone renders it obvious. There was a fifth ground that was anticipation. That's not an issue on this appeal for the simple reason that Belden and the other cases dealt in the context of obviousness. And so we thought it made sense to present kind of a parallel case here. And I think in Gray that you're just seeking a remand, right? Absolutely. So we think that this error under Belden and EWP, in those cases, they actually reversed outright and found the claims were obvious. We're not asking the court to go that far because here the board didn't make findings as to the individual limitations, and it didn't make findings as to secondary considerations, so we're not trying to stretch the court's authority beyond just remanding. I don't want to consume your argument, but before you sit down, maybe you could take a couple minutes. Red has a lot of process. I call them process arguments. I don't know what to call them. Waiver and how you reconstrued what you were saying below in terms of an ultrasound catheter versus just ultrasound and obvious to try not being raised sufficiently or something. So could you just address those briefly? Absolutely. And to be clear, none of those impact the Belden error. I don't think even my friends on the other side would say they impact the Belden error. Those are all about our second primary argument, which was that the board should have found this obvious to try. So happy to address it in that context. And there is some language I recognize. There's some kind of loose language that could be misconstrued. Let me just make very clear. Our position as to the Levin-Acker grounds is that you would take the treatment method described in Levin, which is in the renal context, and you would apply the Acker catheter, the ultrasound catheter. That's exactly what we said at the hearing below. That's what we presented it at here at Blue Brief 16, 23, 36, and 39. We're not trying to change that in any way. Acker doesn't in any way suggest use with renal nerves. And there's obviously a need to protect other portions of the body. And so where the board found that there was no motivation to combine and to use this ultrasound method on another tissue, that doesn't seem unsound. And given the standard of review, why should we overturn that? Here's why I think it's unsound, Your Honor. A couple of thoughts. First, the circulatory system and the use in the circulatory system and the circulatory vessels in Acker is broad and unqualified. So it talks about within the circulatory system. And our view is... Well, it doesn't say any tissue. Well, it comes pretty close. It doesn't use the word any. But we think when you read the summary of the invention, for example, it says insert it into the circulatory system. In column 8, it says not only is it used in the circulatory system, but any tubular structure in or around any tubular structure. That's at column 8. And that's a pretty broad statement. And that's at lines 15 to 26 on page A2138. And if you're going to think about it being applicable in the circulatory system, the renal portion of that is central to it. Levin figure 2, for example, depicts the circulatory system. And the first stop off the heart after the blood comes oxygenated out of the heart is the renal system. Levin says it takes 20% of the blood. That's at A2114. And we know that the renal tubes are about 4 to 10 millimeters. And that's at A4492. And Acker itself says you can size this device to be small. It says preferably small. And that's at column 4, lines 47 to 49 on A2136. It even says most preferably less than 2 millimeters. So Acker itself says you can size this down to less than 2 millimeters, which is sufficient to fit within renal tubes. And as far as the protection of tissue, per your Honor's question, we submit that there's no different disclosure in the patent itself that's being challenged about protecting other tissue. All it says is focus the energy so that you protect and create a reverse gradient on other tissues. That's at A77. That's column 14 of the challenge patent. But, of course, the claim construction in this case says you don't have to protect any particular amount of tissue. That's at page A11. You protect any tissue, and that's sufficient. And then if you look at Acker, it's a similar level of lack of detail when it talks about protecting areas. The ring-like ablated region can be located any distance from the central axis. So it's saying this fixes the problem of too much ablation in the prior art, the Diedrich reference. And the claim 13 of Acker even says don't ablate outside the focal region. So it's talking about protecting other tissue in the same level of detail, we submit, that the challenge patent does. And, therefore, that wouldn't be a basis for rejecting it. And I want to make one point about the Belden and EWP cases. It's notable that in both of those there was expert testimony relied on by the board that said you wouldn't have used this particular feature of the prior art in this claimed context. The board relied on it, credited it, and this court nonetheless came in in Belden and in EWP and said the prior art reference itself on its face is broader and has independent disclosures from that particular feature. So if I had a kidney problem and I was on the operating table and the surgeon was trying to decide what to do, and if I heard him say, well, there's something that has worked in the pulmonary system, let's try it here, I wouldn't feel very comfortable. Well, Your Honor, respectfully, Levin would tend to disagree. So Levin cites the Webster reference, and Levin says you can use catheters similar to those in Webster. Webster notably was in the pulmonary context. It said preferably use its device in the pulmonary context. So Levin itself is equating things used in the pulmonary context. Preferably is a throwing word in patents. It's not very specific. True, but pulmonary was deliberate. Well, I see this case maybe a little different because all we're dealing with is whether you're going to use ultrasound. You're using ACR for ultrasound because Levin uses electric current. So the question is, if I'm Judge Lurie's patient and I'm sitting there and ultrasound is used in a lot of things as an alternative to electric, whether it would scare me if I understood that they were using ultrasound as opposed to electric. That's the universe we're operating in. It really is, Your Honor. That's correct. And Dietrich, for example, that's the patent cited in ACR. Dietrich says essentially RF and ultrasound are both means to ablate tissue. They're both thermal means. Webster says that too, right? Webster doesn't say ultrasound, but Webster says you can use any thermal means. So there's your connection. Levin says use things similar to Webster. Webster says use any thermal means. And Dietrich says these are two thermal means that are well known. And so getting back to Your Honor's question about obvious to try, that's why independently of the Belden error, obvious to try under KSR and Uber, we think would dictate the same result of vacating because these are just interchangeable options, known and predictable. We presented the known and predictable at petition page 33-34 as one of the reasons to find a motivation to combine so that same issue is preserved throughout. And I see I'm in my rebuttal time. I'm happy to answer other questions before I take a seat. We will save your time. Thank you, Your Honor. Mr. Davis. Yes, Your Honor. Thank you. Good morning. May it please the Court. Each of RECOR's arguments here is based on a flawed premise. I'm sorry. It's based on a flawed premise. With respect to ACCR's teachings, RECOR is presuming that ACCR teaches it can be used on any anatomical structure for any purpose. The Board expressly took on that question and said while ACCR has broader teachings in that it says it can be used in a blood vessel and it talks about the circulatory system, ACCR does not teach that it can be used on any anatomical structure in any blood vessel. That means there's no anticipation. Your Honor, that's exactly right. There is no anticipation in hearkening back to that very point. Even RECOR itself, when it made its anticipation arguments below, and this is addressed by the Board at Appendix 33, the Board saw that RECOR itself was referring back to its obviousness arguments because adaptations, changes, needed to be made to ACCR to try to even reach the claims itself. Okay, but the problem, I guess, as Judge Lurie said, we're not talking about anticipation. So my problem, frankly, I'll just put it out there, is that the Board seemed to read ACCR. ACCR doesn't have to disclose renal, right? And it doesn't have to. It would be anticipatory if it did. So what the Board did, though, was give a crabbed reading, in my view, so you can tell me why I'm wrong, relying on the background, which referred to pulmonary veins all over the place, and seemed to say that's the central thing, that this is the be-all and end-all. So you would agree, would you not, that there is certainly language in the specification that goes beyond just pulmonary veins and that the claims don't deal with pulmonary veins. So don't you think the Board's reading can fairly be construed as a crabbed reading of pulmonary veins, nothing more, nothing else? I would respectfully disagree with you on that. And I think that is at Appendix 22 to 25 where the Board is discussing this. And it starts off at Appendix 22 to 23 saying, look, there's these broader statements, and it takes them on, phrases like a blood vessel or tubular anatomical structures. And it says, that's fine, we recognize that. But the problem is, would a person of ordinary skill in the art, because we are dealing with obviousness, would a person of ordinary skill in the art have understood from that that ACCR then could be used effectively on any anatomical structures near any human vessel, including, more specifically, on real nerves near renal arteries, because that is the argument that ReCortis is trying to make here. And then the Board goes on to explain from there why this situation is different. Why you can't just, if you're a doctor treating a patient on the operating table, saying, hey, look, I've read this ACCR reference, apparently I can use this catheter anywhere you want to in the entire human body and not be concerned about the impact of that. ACCR's teachings are directed... It gives pulmonary vein isolation as an example. It also gives treating prostate cancer as another example. But in both situations, ACCR's ultrasound ring is ablating. That means killing all the cells within a 360-degree ring. And there's a reason why it's talking about doing that with tubular structures, because you're always ablating, you're always killing the same tissue throughout. The problem that ReCortis has is it then says, okay, let's not use that in a tubular structure anymore to kill everything within a ring. Let's go outside of that. Maybe we hit a renal artery or a renal nerve, excuse me, but we can hit lots of other things in the process. And the Board talks about this at Appendix 25, where it's also crediting Dr. Tucker's testimony, Medtronic's expert, particularly Paragraph 123 that's at Appendix 92-36. And there the Board is explaining that this is an entirely different non-homogenous context. You're no longer ablating within a tube of the same tissue. You're ablating a non-homogenous context. There could be other things that are around that you're also killing. That's particularly problematic because, as the Board also explains at Appendix 24-25, in a paragraph that spans those two pages, again crediting Dr. Tucker, in the renal neuromodulation application context, the target renal nerve fibers will often not even be within the target region. So not only are you risking killing other things that might fall within that ablation ring, but the renal nerves may not even be there to begin with. The issue of the comparison between the 629s disclosures and ACR couldn't be more stark of a difference. RECOR raises this argument, and we address it at a couple different points in our red brief, particularly pages 8-9 and 43. As a primary starting point, and I think as RECOR concedes, ACR itself does not teach application in a renal context to go after renal nerves, and it does not teach at the same time protecting non-target tissue in the blood vessel wall from thermal injury. That's not taught in RECOR. In fact, the examples ACR gives is to actually kill the blood vessel wall, create a circular lesion in it. But then the specification in the 629 patent goes on with example after example as to how you would protect the non-target tissue while also targeting the renal nerves. For example, this is at Appendix 73, Column 5, Lines 6-11 of the 629 patent. It talks about providing protective cooling elements such as convective that are protective cooling elements. Or in Column 5 also, Lines 14-17, you could have blood flow as a conductive or convective heat sink. Where did the board discuss all of that with respect to the 629? Your Honor, some of that is discussed by the board in the final written decision. That's what I'm looking at. The board, for example, Appendix 4 cites to Column 5, Lines 6-11, which talks about the protective cooling elements. Appendix 6 also talks about the catheter may focus ultrasound to produce a reverse thermal gradient. That's citing to the 629 patent, Column 14, Lines 52-55. That's at Appendix 77. And then also the concept of focusing dynamically so that you're actually targeting the renal nerves. That's at Appendix 6. And that's citing to Column 14, Lines 44-51 of the 629 patent, which is at Appendix 77. And in addition to that, there's a whole bunch of additional disclosures.  Can I get back to the central point, which is what we started with? And I don't want to beat a dead horse, but in terms of what the board actually relied on and whether it limited it to just pulmonary. Looking at what you directed me to on Appendix 26, they say some of the relied upon statements in ACCR are conclusion statements at the end of lengthy passages disclosing more specific uses that do not support petitioner's position. Because they're conclusion statements. I mean, it seems like the board said we can ignore all of that. I mean, am I taking this impression? They go on to talk about the background focuses almost entirely on the use of its ultrasound catheters in a pulmonary vein rather than a renal. I mean, the final conclusion that we're debating is at Column 2, right? And if you look at it, it says, despite all these efforts devoted, blah, blah, blah, for ablating a circular region around a blood vessel. And then when you start with the summary of the invention, it goes on right after that to say the present invention addresses these needs. So doesn't these needs, which it's saying the present invention discloses, suggest that it's larger than just pulmonary veins? Your Honor, I agree that it's larger than pulmonary veins, and I think the board does, too. You were addressing Appendix 26. Appendix 22 to 23. I was addressing 23, but anyway, go ahead. Apologies, Your Honor, if I misunderstood the citation. But Appendix 22 to 23 also takes on those statements as well, that you can use them in these larger, in these tubular contexts, for example. But that ignores the important distinction here that the board also addresses at Appendix 25, saying, look, there's a difference between a homogenous context where you're ablating a ring inside of the blood vessel wall, which is what the vast majority of ACRA is directed to, and a non-homogenous context where you're instead trying to only hit these renal nerves that are outside of the blood vessel wall, for example. Do you agree that there are a limited number of choices here? You've got ultrasound, you've got that list in Wang where it just lists six or seven alternatives. I think your friend says there are 10 options here to pick from. Do you agree there's a limited number? I respectfully disagree, Your Honor, for a couple of different reasons. As the board properly noted, both Wang and Dietrich are directed towards the pulmonary vein isolation context. But in addition to that, these are larger categories of ablation mechanisms. So even inside, take ultrasound for example, ACRA itself is one way to set that up, where you're ablating in a 360 degree ring, using ultrasound in a focused manner, for example. There's many different permutations for how you would set it up, even inside of ultrasound alone, setting aside all the other 10 categories, of which have many different permutations. In their arguments below, and this is why we've seen them flip back and forth between, well, are we using Levin's catheter and just swapping in ultrasound? And now again, they switched here at oral argument to go back to what their trial grounds were, always relying on ACRA's catheter, because when you're relying on that particular catheter, that's only one of hundreds of different permutations for how you could set up the ultrasound catheter. It's not a discrete, finite list of options. The board also explained this further in crediting Dr. Tucker's testimony. Dr. Tucker was explaining, this is at appendix 29, quoting Dr. Tucker at appendix 92-32, paragraph 16 of his testimony, that Huang includes every single energy source that has been developed for lesion generation without any rationale for discriminating between the energy sources, does not inspire confidence in applying those energy sources for denervating the fine structures of renal nerves. You're no longer looking to create large circular lesions that you would in, for example, the pulmonary vein isolation context as you are in Huang. Instead, you're dealing with these fine renal nerve structures, which is a very different context. And that circles back to the point that the board raised earlier at appendix 24 and 25. This context is very different. You're not dealing with a homogenous context where everything you hit and kill is all the same tissue and that's your goal. You're instead applying it in a very different non-homogenous context where you could be hitting lots of other things. RECOR also raised the Webster issue, and the board directly addressed that as well. Levin says, catheters similar to Webster can be used. The problem RECOR has is it never attempted, as the board noted at appendix 21-22, RECOR never even attempted to say or show, here's how Webster's catheter is similar to Acker's. In fact, there's many differences between Webster and Acker, which is why RECOR never even attempted to make that showing. But Webster uses ultrasound too, right? Or no, any thermal. It says any thermal. Webster does not mention ultrasound. But it does any thermal. It does say any thermal. What Levin is looking at in Webster is it's saying similar catheters can be used. The specific catheter that's disposed in Webster, this is for example in figure 2A of Webster, is an RF catheter that's very, very similar to the way in which Levin works. Both of them were using RF where you put an electrode up towards the side of the vessel wall, very different from the context of what Acker has in using ultrasound with a balloon where there's no blood flow, for example, that would go through that structure. So each of these differences, at each of these points, and with RECOR shifting arguments, the board at every point said, look, RECOR, your arguments here fall short. Substantial evidence supports the board's findings that Acker itself doesn't teach that it can be used on any anatomical feature anywhere in the body, let alone in a particular area of renal nerves on renal arteries, and for the very reason that you're going to be killing a lot of other tissue in that region, which is why they haven't shown a person of ordinary skill in the art would have been motivated to use it. Unless there's any further questions, Your Honor. Thank you, Counsel. Mr. Bell has a couple of minutes for a bubble. Thank you, Your Honor. Just taking a step back, I think what's become clear here is that what my friends are really trying to do is make this about anticipation. Make it about whether the prior art reference specifically came out and said renal. So in one of the passages where it broadly talks about the circulatory system, if it had said comma, for example, in the pulmonary, renal, et cetera, et cetera context, we wouldn't even be having this discussion. It would be clear that the board, in Your Honor's words, took a crabbed view. I think that's exactly the right term. It took a crabbed view of the prior art. It read it only as applying to the pulmonary context or principally. Everything else where it discusses the broader disclosures of Acker all kind of comes back to what the board said. You didn't show that the pulmonary context applied to others. And if I could invite the court to look at our reply brief at page 16. When you look at the differences between the two, we have Acker on the one side, focused ultrasound. 629 on the other side, focused ultrasound around a tubular vessel. And I wanted to address one thing my friend said today and in their briefs. They talked a lot about how Acker is only about ablating homogenous tissue in the vessel wall. And respectfully, I couldn't disagree more, and Acker couldn't disagree more, because in column eight, it says, although, and this is at lines 15 to 20, although the invention has been described above with reference to ablation of blood vessel walls, so not even pulmonary, but blood vessel walls, the same techniques can be used to ablate ring-like regions around other tubular anatomical structures, including, for example, the urethra. That is in no way limited to ablating the homogenous tissue within the wall of those tubular structures. It can include things around it. And nobody denies that the renal nerves are, in fact, around. And so then, Acker, we think, on its face, applies, and that the board needed to consider it for its full context. Despite expert testimony to the contrary, that was true in EWP. There was expert testimony that this court said, I think used a colorful word, led the district court astray, or something to that effect. Similarly, in the Belden case, the expert testimony that the board cited at length, some of it undisputed, nonetheless didn't negate the very clear disclosures that were not insulation-specific in Belden. Those are the reasons we think the court should vacate and remand and let the board reconsider. Thank you, Your Honor. Thank you, Counsel. The case is submitted, and that concludes today's arguments.